**H.K. MALLAK, INC. and Eshagh Kashimallak, Plaintiffs,**

v.

**FAIRFIELD FMC CORPORATION, a subsidiary of Marriott International, Inc., Defendant.**

No. 96–C–1207.

United States District Court, E.D. Wisconsin.

Jan. 21, 1999.

U.S.C. § 1981a(b)(3)(A), (D).

Joseph A. Bradley, Milwaukee, WI, for plaintiffs.

Tomislav Z. Kuzmanovic, Hinshaw & Culbertson, Milwaukee, WI, for defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

In this diversity case the plaintiff, Eshagh Kashimallak, alleges that he was robbed of over $1 million in jewelry and precious gems at gunpoint in his room at the Fairfield Inn located in Brookfield, Wisconsin. He and the employer for whom he was carrying the jewelry and gems sue the hotel's manager and operator for negligence in preventing the attack and theft.

### I. THE UNDISPUTED FACTS

Kashimallak is a jewelry salesman from New York whose territory includes Wisconsin. Kashimallak works for and is a part owner of plaintiff H.K. Mallak, Inc. On August 23, 1995, Kashimallak, who had reserved a room prior to his arrival, checked into the Fairfield Inn in Brookfield at about 8:45 or 9:00 p.m. Prior to that date Kashimallak had stayed at the Fairfield Inn in Brookfield seven to eight times during business trips to Wisconsin. Defendant Fairfield FMC Corporation manages and operates the Fairfield Inn in Brookfield.

At the Fairfield Inn in Brookfield, when a guest with a reservation checks in and gives the clerk his or her name, the clerk brings up the reservation on the computer, which lists the room type request, location preference and smoking preference. A guest is assigned a room number at that time. The clerk then completes a reservation card showing the room rate, date of departure, form of payment and room number. The guest signs the reservation card, the clerk hands the guest a plastic key card that opens the security door to the floor and the door to the guest's room, and the clerk directs the guest to the room. A guest is *not* assigned a room number until he or she checks in at the front desk.

It only took two or three minutes for Kashimallak to check into the Fairfield Inn on August 23, 1995. He received a key card and at that time was assigned to room 334.

According to the Fairfield Inn's general manager, Patricia Collins, the plastic key cards given to guests are "Ving" key cards: plastic cards about three inches by an inch and a half having holes at one end that match what is inside the door lock. Rooms are not ordinarily "rekeyed" between guests. When a guest checks out, he or she turns the cards back in; management does not change the lock.

Whenever a door is rekeyed it starts out with three keys. Between guests, the keys are kept together in the registration area such that a clerk checking a guest in can determine at that time how many key cards are there. Collins indicated at deposition that it sometimes happens that guests do not turn in their key cards when they leave. The Fairfield Inn in Brookfield has no protocol regarding any action to be taken if all three keys are not in place between guests. Instead, according to Collins, hotel policy states that only "if there were one or fewer keys, we should rekey the room or if a guest who was occupying the room feels uncomfortable, we should rekey the room at that point." (Collins Dep. at 18.)

Room 334 had been rekeyed on August 19, 1995, after a guest in that room was evicted, so that the evicted party could not reenter the room. After the rekeying of the door lock, there were three new key cards for the room. Three individuals may have used the room between the rekeying and when Kashimallak checked in (*see* Perket Aff. at 26), and it is undisputed that at the time Kashimallak registered there were only two key cards remaining to room 334. Collins admitted at deposition that because a key was missing for room 334 there was a potential for the person with that key to be able to get back into the room. (Collins Dep. at 33.) It does not appear that Kashimallak was told of that possibility.

After he checked in, Kashimallak went directly to his room carrying two bags. One bag contained his personal items and the other bag contained jewelry. Kashimallak was also carrying jewelry in a special vest

hidden under his shirt. Kashimallak took the elevator to reach the third floor where his room was located. He did not see anyone on the elevator, nor did he see anyone from the time he left the elevator until the time he reached his room. Between the elevator and his room Kashimallak had to use his key card to get through a locked security door and gain access to the third floor.

Kashimallak reached room 334 and used his key card to enter. He went in, closed the door behind him and put on the chain lock, turned around, and took one step. Two masked individuals then attacked him inside the room. The two intruders punched Kashimallak in the head, threatened him with a gun, and robbed him of the jewelry he was carrying in the his bag and in his vest. The assailants made off with loose diamonds, bracelets, necklaces, pendants, earrings and solitaire diamonds.[1]

Prior to and on August 23, 1995, the Fairfield Inn in Brookfield was in compliance with the provisions of Wis. Stat. § 254.80. Each room contained a Wisconsin Hotelkeeper's Liability Placard, posted in compliance with section 254.80, advising and notifying guests that the hotel was not liable to any guest for loss of money, jewelry, precious metal or stones, personal ornaments or valuable papers that were not offered to the hotel for safekeeping.

The Fairfield Inn in Brookfield had many security measures in place on and before August 23, 1995, in order to provide adequate protection for its guests. These measures included nightly security walks by hotel personnel to ensure that all rooms were closed and key cards were not sticking out of doors; the questioning of suspicious individuals on the premises; the assignment of room numbers only at the time of check-in; the refusal by staff to disclose other guests' room numbers; the refusal by clerks to give out room keys without proper identification; the locking of the entire floor by a security door requiring a key card for entry; and patrolling of the hotel parking lots by the Brookfield Police Department.

The general manager of the Fairfield Inn recalled that the police had been called to the hotel twice because of a domestic dispute between a boyfriend and girlfriend and/or husband and wife, and the police were also called to the hotel to handle noise complaints.

According to the Brookfield police, the Fairfield Inn in Brookfield is located in an area with almost no crime. Prior to August 23, 1995, the Fairfield Inn in Brookfield had no history of any armed robbery and assault of a guest and no history of any crime involving forced entry into a hotel room. Prior to August 23, 1995, the police could not recall any robberies that had occurred at any hotel or motel within the last ten years.

According to the police and police records, from January 1, 1993 through August 22, 1995, Brookfield police officers were called to the Fairfield Inn in Brookfield for two ambulance assists, one battery, one protective placement under Wis. Stat. § 55.06(11), one false fire alarm, twelve field investigations, one fire assist, one theft and twenty-three vehicle lockouts. The battery was reported on April 9, 1995, by a Fairfield Inn clerk who was sprayed with pepper spray in the hotel parking lot when he approached an individual attempting to enter a vehicle. The theft was reported on August 11, 1995, and involved a guest who went to the front desk of the hotel to deposit an envelope containing $3,700 in cash into one of the hotel's safety deposit boxes. The guest put the envelope full of cash on the front desk counter and looked away for a moment; when the guest looked back, the envelope was gone. The money was found the same day in a garbage can in the employee rest room. The field investigations conducted were of underage drinking.

## II. SUMMARY JUDGMENT STANDARD

As is well known, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the

---

**1.** Defendant indicates that although it disputes whether this attack and theft actually occurred, for purposes of the current motion it can be assumed that Kashimallak's story regarding these events is true.

moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of demonstrating the lack of a factual dispute and that it is entitled to judgment as a matter of law. *Id.* at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. 2548.

The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir.1997). Summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Whether a material issue of fact is "genuine" necessarily requires some qualitative determination of sufficiency of the evidence. "A district judge faced with [a summary judgment] motion must decide . . . whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is proper. *Matsushita Elec. Indus.Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## III. ANALYSIS

In claim one of the complaint the plaintiff company sues Fairfield FMC for negligent management, operation, maintenance and control of the premises of the Brookfield Fairfield Inn, resulting in the loss of property totaling $1,188,700. In claim two plaintiff Kashimallek sues Fairfield FMC for negligent management, operation, maintenance and control of the premises of the Brookfield Fairfield Inn, resulting in the assault and battery on Kashimallak. Kashimallak alleges he suffered severe injuries in the attack and still suffers great pain; he asks for a sum of $1,000,000 in damages.

### A. The Hotel's Duty of Care

 The parties agree that in this diversity case I apply Wisconsin law, *see Kutsugeras v. AVCO Corp.,* 973 F.2d 1341, 1346 (7th Cir.1992), under which "a hotel has a duty to exercise ordinary care to provide adequate protection for its guests and their property from assaultive and other types of criminal activity." *Peters v. Holiday Inns, Inc.,* 89 Wis.2d 115, 123, 278 N.W.2d 208 (1979). A hotelkeeper "must provide security commensurate with the facts and circumstances that are or should be apparent to the ordinarily prudent person." *Id.* The standard of care may vary according to the particular circumstances and location of the hotel. *Id.* at 123–24, 278 N.W.2d 208.

 A hotelkeeper's duty depends on foreseeeablity of the injury. A hotelkeeper's duty " 'is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone.' " *Id.* at 123, 278 N.W.2d 208 (quoting *A.E. Inv. Corp. v. Link Builders, Inc.,* 62 Wis.2d 479, 484, 214 N.W.2d 764 (1974)). There is no duty on the part of a hotelkeeper, however, to guard against abnormal or unusual events or things that with reasonable care, skill, and foresight could not have been anticipated, discovered, or prevented; its duty is to protect only against those risks that it could have discovered in the exercise of ordinary care. Wis. JI–Civil 8050.

■ Relevant factors in deciding whether a hotel has exercised ordinary care in providing adequate security are: industry standards, the community's crime rate, the extent of assaultive or criminal activity in the area or in similar business enterprises, the presence of suspicious persons, and the peculiar security problems posed by the hotel's design. *Peters*, 89 Wis.2d at 124, 278 N.W.2d 208.

■■ Once negligence is established, the defendant is liable for unforeseeable consequences as well as foreseeable ones. *Id.* at 123, 278 N.W.2d 208. "The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act." *A.E. Inv.*, 62 Wis.2d at 483, 214 N.W.2d 764.

In *Peters*, the leading Wisconsin case regarding a hotelkeeper's liability for the security of guests, the plaintiff was similarly assaulted and robbed in his motel room. The *Peters* assailant, a former employee of the motel, entered the motel's lobby at 3:00 a.m., asking whether another employee was working that night. After being told "no," the assailant left the lobby but did not exit the building. Instead, he slipped into a kitchen area and stole a bellboy's shirt. Peters's room was in a building separate from but adjacent to the building containing the lobby, and did not require one to go through the lobby for entrance. The separate building had no locks on the outside doors or monitoring by closed circuit television or security personnel. The assailant went into the separate building and, after trying at least one other room without success, knocked on Peters's door and said he had a message from the front desk. Peters looked through the peephole, saw someone he thought was a motel employee, and opened the door. The assailant and some hidden accomplices pushed their way in, held Peters at gunpoint, took $700 in cash and Peters's keys, and forced Peters to accompany them to Peters's own car. As the intruders were pushing Peters into the car, alert police officers intervened. Previous to the Peters incident, the motel, located in the Milwaukee suburb of Wauwatosa, had had few incidents requiring calls to the police.

The Supreme Court of Wisconsin found that summary judgment could not be granted on the facts of the *Peters* case, because a reasonable jury could find that the motel should have taken further precautions. According to the court, based upon the duty of ordinary care imposed on the hotel to provide security and the facts of the *Peters* case, "reasonable persons could draw competing inferences as to whether the defendant motel provided adequate security." *Peters*, 89 Wis.2d at 126, 278 N.W.2d 208.

In *Peters* the Supreme Court of Wisconsin further recognized that granting summary judgment in cases involving a hotelkeeper's duty of care is not typical:

> Hotel liability cases requiring a plaintiff to prove the innkeeper's failure to exercise ordinary care commensurate with the circumstances are difficult cases which will present our trial courts with many matters of complex factual proof that usually cannot be decided on the basis of affidavits in support of summary judgment.

*Id.* at 129, 278 N.W.2d 208.

■ Fairfield FMC argues that the criminal attack on Kashimallak was an abnormal or unusual event that could not have been anticipated with reasonable care. According to Fairfield FMC, it could not have reasonably foreseen or anticipated that unknown assailants would be in room 334 to rob and assault Kashimallak because the hotel had assigned him to room 334 only minutes before the attack, the hotel does not disclose room numbers, the hotel does not give out room keys without proper identification, the third floor was a secured floor that needed a key card for access, the hotel had no prior history of armed robbery and assault or forced entry into a room, and the hotel was located in an area with almost no crime. Under these circumstances, says defendant, "no evidence exists to show that defendant should have reasonably anticipated that a guest would be subject to an armed robbery and assault by unknown assailants in his hotel room." (Def.'s Br. in Support at 3.)

Similar to the *Peters* case, however, reasonable persons could draw competing inferences as to whether the defendant provided adequate security. *See Peters*, 89 Wis.2d at 126, 278 N.W.2d 208. The "key" here is the missing key card to room 334. Someone between August 19 and 23, 1995 kept a key card to room 334. As even the general manager of the Brookfield Fairfield Inn admitted, that person had access back into the room, as the lock had not been rekeyed. There apparently were no signs of forced entry by the intruders. Therefore, taking all inferences in plaintiffs' favor, as I must, the missing key card was not just lost somewhere. The intruders who attacked Kashimallak had kept it and used it to gain entry to his room before he entered.

Fairfield's argument mainly is premised on the unforeseeability of an attack on Kashimallak himself, because of the fact that his room number was not assigned until minutes before he went up to room 334. The argument assumes that these intruders targeted Kashimallak, but no evidence presented by defendant indicates that was the case. Here, taking all facts and inferences in Kashimallak's favor, whoever robbed him was waiting around to attack whoever was assigned to room 334, whether the victim was carrying $100 in cash or $1 million in jewelry and gems. The intruders did not necessarily know they would hit the jackpot with Kashimallak; they just planned on taking whatever came along.

Rather than focusing on a planned attack on Kashimallak, the proper scope of the inquiry instead is whether it was reasonably foreseeable that any guest who was checked into a room from which a key card was missing could be assaulted and robbed. I believe a reasonable jury could indeed find it reasonably foreseeable that if locks are not rekeyed between guests and a key card to that lock is missing, a prior guest could enter and assault or rob a later occupant. The prior guest would likely not look suspicious, as he or she had just recently been a welcome customer, and most staff members might not know the person had checked out. The fact that such an intruder would have a key card would render ineffective the third floor security door as well as any outer doors requiring key card access. The fact that the Fairfield Inn was located in a low-crime neighborhood would have only slight impact, as the intruders would likely be former guests, not nearby residents.

Protection of incoming guests from the missing key problem likely would have put little burden on the hotel. Of course, whenever a key disappeared, a room could be rekeyed, which appears to be relatively easy with the Ving system. Alternatively, if the computer assigned an incoming guest to a room with a missing key, the hotel's policy could be that the registration clerk would automatically reassign the patron to another room unless none were available, or an incoming guest could be notified that a card was missing and given a choice regarding whether to take the room as is or to request a room change or ask for the lock to be rekeyed.

That the Fairfield Inn had never experienced any major crime, let alone an armed robbery and assault of a guest, prior to the attack on Kashimallak is evidence that perhaps management reasonably did not worry about missing cards. That the Fairfield Inn had other security measures such as patrols of the building by personnel and of the parking lot by police, the questioning of suspicious persons, and the secrecy regarding a particular guest's room assignment also will weigh in the hotel's favor. But this just means that there is a jury question requiring trial. Plaintiffs have *some* evidence—that the Fairfield Inn did not care if key cards were missing when it assigned an incoming guest to a room—indicating that defendant was negligent by failing to take action against a reasonably foreseeable harm. And that is enough at this point.

## B. Wisconsin Statute § 254.80

■ Nevertheless, Wisconsin law precludes the plaintiff company's claim of property loss. The Wisconsin hotelkeeper's liability statute provides that a hotelkeeper "is not liable to a guest for loss of money, jewelry, precious metals or stones ... which are not offered for safekeeping" if the hotelkeeper: (1) has doors on the rooms equipped with

locks or bolts; (2) by notice printed in large plain English type and posted conspicuously in each sleeping room, offers to receive valuable articles for safekeeping and warns that the hotel is not liable for loss unless the articles are tendered for safekeeping; and (3) has a safe or vault suitable for keeping the articles and accepts articles for safekeeping when tendered by a guest. Wis.Stat. § 254.80(1) & (2).[2]

H.K. Mallak admits both that the Fairfield Inn met all of these requirements of section 254.80 and that its employee, Kashimallak, did not tender his jewelry and gems to the Fairfield Inn for safekeeping. Plaintiff company's sole argument against application of section 254.80 is that it should not be held to the posted notice provision because Kashimallak did not see such a notice when he checked in, was not verbally warned by staff when he registered, and did not have a chance to see or read the notice in his room before he was attacked.

The statute requires the posting of the notice only in sleeping rooms, not registration desks, and commands no verbal warnings in order for the hotelkeeper to be pro-tected. H.K. Mallak cites no authority whatsoever indicating that there is any exception to the hotel's liability once the requirements of section 254.80 are met. The court's independent research turned up no Wisconsin case or statute providing for any exception to the hotelkeeper's exemption from liability, let alone an exception based upon a guest's lack of actual or constructive knowledge.

Kashimallak, the company's representative, had constructive knowledge of the posted notice in any event. He had stayed at the Brookfield Fairfield Inn seven or eight times before the night he was attacked. In addition, the Wisconsin hotelkeeper's liability statute has counterparts in several other states, including the plaintiffs' home state of New York. *See* N.Y.Gen.Bus.Law § 200;[3] *see also, e.g.,* Ark.Code Ann. § 20–26–302; Fla.Stat. ch. 509.111; Mich.Comp.Laws § 427.102; Minn.Stat. § 327.71; Ohio Rev. Code Ann. § 4721.01.

It is possible that the last sentence of Wis.Stat. § 254.81[4] could have some effect on the application of section 254.80 in this case. H.K. Mallak, however, does not make

---

**2.** At common law an innkeeper was responsible for all property losses at the hotel except in very limited circumstances. In 1864 Wisconsin, like numerous other states around that time, abrogated the common law rule through passage of a statute limiting a hotelkeeper's liability; the current form of that statute is Wis.Stat. § 254.80. *See Busley v. Hotel Wisconsin Realty Co.,* 166 Wis. 294, 164 N.W. 826 (1917) (discussing the history and meaning of the statute).

**3.**

Whenever the proprietor or manager of any hotel, motel, inn or steamboat shall provide a safe or safe deposit boxes in the office of such hotel, motel or steamboat, or other convenient place for the safe keeping of any money, jewels, ornaments, bank notes, bonds, negotiable securities or precious stones, belonging to the guests of or travelers in such hotel, motel, inn or steamboat, and shall notify the guests or travelers thereof by posting a notice stating the fact that such safe or safe deposit boxes are provided, in which such property may be deposited, in a public and conspicuous place and manner in the office and public rooms, and in the public parlors of such hotel, motel or inn, or saloon of such steamboat; and if such guest or traveler shall neglect to deliver such property, to the person in charge of such office for deposit in such safe or safe deposit boxes, the proprietor or manager of such hotel, motel or steamboat shall not be liable for any loss of such property, sustained by such guest or traveler by theft or otherwise; but no hotel, motel or steamboat proprietor, manager or lessee shall be obliged to receive property on deposit for safe keeping, exceeding one thousand five hundred dollars in value; and if such guest or traveler shall deliver such property, to the person in charge of such office for deposit in such safe or safe deposit boxes, said proprietor, manager or lessee shall not be liable for any loss thereof, sustained by such guest or traveler by theft or otherwise, in any sum exceeding the sum of one thousand five hundred dollars unless by special agreement in writing with such proprietor, manager or lessee.

N.Y.Gen.Bus.Law § 200.

**4.** Wisconsin Statute § 254.81 reads in full:

Every guest and intended guest of any hotel upon delivering to the hotelkeeper any baggage or other property for safekeeping, elsewhere than in the room assigned to the guest, shall demand and the hotelkeeper shall give a check or receipt, to evidence the delivery. No hotelkeeper shall be liable for the loss of or injury to the baggage or other property of a hotel guest, unless it was delivered to the hotelkeeper for safekeeping or unless the loss or injury occurred through the negligence of the hotelkeeper.

the argument—in fact it never mentions section 254.81 at all. While the question of how sections 254.80 and 254.81 interact is an interesting one, the parties have not developed the issue or even raised it. I decline, therefore, to predict in this situation what Wisconsin courts would say. Any argument regarding section 254.81 is waived. *See Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1149 (7th Cir.1998); *Washington Nat'l Ins. Co. v. Hendricks*, 855 F.Supp. 1542, 1554 (W.D.Wis. 1994).[5]

As a result, H.K. Mallak's claim for loss of the jewelry and gems is completely barred by Wis.Stat. § 254.80 and summary judgment in favor of defendant therefore must be granted on claim one of the complaint. Section 254.80 does not, however, in any way bar Kashimallak's own claim for personal injuries. *See Peters*, 89 Wis.2d at 129, 278 N.W.2d 208 (application of section 254.80 (then section 50.80) remanded for trial together with the separate issue of the motel's liability for personal injuries).

## IV. JURISDICTION

Plaintiff Kashimallak is a resident of the state of New York; plaintiff H.K. Mallak,

---

5. When originally enacted, what now is section 254.80 and 254.81 was passed together as chapter 318, Laws of 1864. The two sections were later separated, however, because they did not harmonize with a new statutory scheme; they became sections 1725 and 1726 of the Statutes of 1878. *See Busley*, 166 Wis. at 296–97, 164 N.W. 826. An argument can be made, though, that the two sections still should be read together and that the reference to "other property" in the final sentence of section 254.81 includes the jewelry and other items listed in section 254.80, allowing the claim for property loss in the current case to continue because of defendant's alleged negligence. Alternatively, it can be argued that the specific statute controls over the general statute—that the property specifically listed in 254.80 is controlled by that section alone, while the "baggage or other property" generally discussed in 254.81 means property other than that described in section 254.80—or that section 254.80 creates a presumption of contributory negligence on the part of a guest who fails to avail himself of a hotel's safe.

In *Busley*, decided back in 1917, the Supreme Court of Wisconsin held that a hotelkeeper was liable for the full value of jewelry delivered by a guest for deposit in the hotel's vault when the loss of the property occurred through the theft or gross negligence of the hotel's employees. The court thus read the final sentence of what is now section 254.81 as overriding the protection of what is now section 254.80 when property has been delivered to the hotel and then lost. No Wisconsin case, however, deals with the different situation where a guest has failed to deliver jewelry to the hotel at all and the hotel's negligence then causes a loss of property from the guest's room. But *Busley* does support the argument that section 254.81's preservation of full liability for negligence prevails.

*Busley*, though, supports the contrary position as well. Sections 1725 and 1726 of the Statutes of 1878 were amended in 1913. The *Busley* court found it

> evident that the Legislature, in the re-enactment of sections 1725 [now 254.80] and 1726 [now 254.81] in 1913, dealt with two distinct and separate classes of property. Section 1725 is limited to "money, jewelry and articles of gold or silver manufacture and of the like," while section 1726 deals with "baggage or other property of his guest," presumably kept in the room assigned to the guest. . . .

*Busley*, 166 Wis. at 300, 164 N.W. 826.

Whether section 254.80's protection of the innkeeper or section 254.81's preservation of full liability for negligence controls in a case such as the present thus is an open question in Wisconsin. No clear trend is apparent from a cursory Westlaw search regarding similar statutes in other states. In Ohio, for instance, where Ohio Rev.Code Ann. § 4721.01 mirrors Wisconsin's section 254.80 regarding protection from liability and Ohio Rev.Code Ann. § 4721.02 indicates that an innkeeper shall be liable for a loss of "any such property" caused by the innkeeper's negligence, Ohio courts have read the statutes to mean that an innkeeper is liable due to its own negligence only when a guest has delivered the jewelry to the innkeeper for safekeeping. *See World Diamond, Inc. v. Hyatt Corp.*, 121 Ohio App.3d 297, 305–06, 699 N.E.2d 980 (1997) (discussing *Chase Rand Corp. v. Pick Hotels Corp.*, 167 Ohio St. 299, 147 N.E.2d 849 (1958)). In New York, however, a hotel was held liable for its own negligence even where a guest failed to delivery jewelry for deposit into the hotel's safe. *See Chatillon v. Co–Operative Apartment Co.*, 90 Misc. 108, 152 N.Y.S. 593 (Sup.Ct.), *aff'd*, 171 A.D. 910, 155 N.Y.S. 1097 (1915), *cited in Zaldin v. Concord Hotel*, 48 N.Y.2d 107, 421 N.Y.S.2d 858, 397 N.E.2d 370 (1979). Other states have eliminated the problem by clarifying their statutes. See, *e.g.*, Or.Rev.Stat. § 699.010, in which the pertinent sentence reads: "Every innkeeper or hotelkeeper is liable for the loss of any property of a guest in his inn or hotel, whether or not the property has been accepted for safekeeping as provided in this section, if the loss is due to the theft or negligence of the innkeeper, hotelkeeper or any of his servants."

In any event, again, while the question of what present-day Wisconsin courts would say about the interplay of sections 254.80 and 254.81 is intriguing, the parties have not presented it to me. A prediction of Wisconsin law on the matter thus is not warranted in this case.

Inc., is a New York corporation with its principal place of business in New York as well. According to the complaint, defendant Fairfield FMC is a subsidiary of Marriott International, Inc., which in turn is a Delaware corporation with an unknown principal place of business.

The court has an obligation to make sure that it indeed has diversity subject matter jurisdiction. The parties, however, have given me no information confirming that defendant Fairfield FMC is diverse from the plaintiffs.

Within 7 calendar days of the date of this order, the parties are to file a stipulation as to the state of incorporation and state of the principal place of business of defendant Fairfield FMC. If either is New York, this case will be dismissed for lack of subject matter jurisdiction. The parties are to inform me as well about the location of Marriott International's principal place of business.

In the event the parties cannot agree on the states of incorporation and principal places of business, within 7 calendar days of the date of this order the parties are to file simultaneous five-page briefs and evidence supporting their allegations on the matter.

## V. TRIAL DATE

Finally, on January 15, 1999, I received a letter from plaintiffs' counsel indicating that he deems it "of the utmost importance that [he] take depositions of the defendant's expert witnesses prior to facing them in the courtroom" and that because he had not received a decision on the summary judgment motion he was not fully prepared for trial. As the parties were warned in the court's scheduling order of January 23, 1997: "Neither the pendency of motions nor settlement discussions shall affect any of the dates set in this action, and neither shall justify delays in the taking of discovery." (Order of 1/23/97 at 2.) Discovery in this case closed December 19, 1997, and expert witnesses were named back in April 1998, leaving plenty of time for plaintiffs' counsel to get the information he needed.

Trial will start on February 9, 1999, regardless of whether plaintiffs' counsel has deposed defendant's expert witnesses in California and the final pretrial conference will proceed on January 27, 1999 at 1:30 p.m.

## VI. CONCLUSION

**THEREFORE, IT IS ORDERED** that summary judgment is **GRANTED** in favor of defendant on count one of the complaint, alleging property loss, but **DENIED** on count two of the complaint, alleging personal injury by plaintiff Kashimallak.

**FURTHER, IT IS ORDERED** that within 7 calendar days of the date of this order, the parties are to file a stipulation as to the state of incorporation and state of the principal place of business of defendant Fairfield FMC Corporation and the location of Marriott International's principal place of business.

In the event the parties cannot agree on the states of incorporation and principal places of business, within 7 calendar days of the date of this order the parties are to file simultaneous five-page briefs and evidence supporting their allegations concerning the matter.